UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORTEK INC.,

               Plaintiff,

         -against-

ITT LLC,

               Defendant.

**MEMORANDUM OPINION
AND ORDER**

21-CV-03999 (PMH)

PHILIP M. HALPERN, United States District Judge:

Nortek Inc. ("Plaintiff") commenced this action against ITT LLC ("Defendant") on May 5, 2021. (Doc. 1, "Compl."). Plaintiff asserts three claims for relief: (1) breach of contract; (2) specific performance; and (3) implied (common law) indemnification.

Before the Court is Defendant's motion to compel Plaintiff to arbitrate its claims. Defendant moved on June 2, 2021 (Doc. 9; Doc. 10, "Def. Br."; Doc. 11, "Brown Decl."), Plaintiff opposed on June 16, 2021 (Doc. 19, "Pl. Opp."), and the motion was fully briefed with Defendant's submission of a reply brief on June 23, 2021 (Doc. 20, "Reply").

For the reasons set forth below, Defendant's motion to compel arbitration is GRANTED.

## BACKGROUND

Plaintiff is a manufacturer and distributor of building products for residential and commercial applications. (Compl. ¶ 2). Defendant is a global, multi-industrial manufacturer of highly engineered critical components and customized technology solutions for a wide range of transportation, industrial, and energy markets. (Def. Br. at 2). In 1963, Defendant acquired a product line of unit heaters for domestic and industrial applications (the "Reznor Business").[1] (*Id.*;

---

[1] The APA defines the Reznor Business as "the business conducted or currently proposed by Seller to be conducted by Seller's Reznor division, but excluding the business conducted by the Reznor Europe division of ITT Industries Belgium S.A.[]" (APA at 33).

Brown Decl. ¶ 10). Certain products manufactured by the Reznor Business allegedly contain asbestos. (Compl. ¶ 8).

ITT Corporation,[2] ITT Industries of Canada, Ltd., National Temperature Control Centers, Inc., and ITT Industries Limited (collectively, "Seller") entered into an Asset Purchase Agreement (Compl. Ex. A, "APA") dated June 28, 1985 with FL Industries, Inc. ("FL" or "Buyer") to "convey certain assets" to FL, including the Reznor Business. (Compl. ¶¶ 1, 8; APA at 2, 33).[3] Among other things, the APA contains a provision obligating Seller to:

> indemnify and hold harmless Buyer . . . against any and all Losses arising out of or resulting from: . . . (iv) any failure by Seller, after the Closing, to pay, perform and discharge all of its obligations and liabilities, fixed or contingent, and whether arising or to be performed prior to, on or after the Closing, relating to any of the Businesses[4] and not expressly assumed by Buyer in Section 1.3(a), 7.11 or 8 hereof . . . .

(APA at 173).

In January 1992, Thomas & Betts Holdings, Inc. ("T&B") acquired FL and the Reznor Business. (Compl. ¶ 16; Def. Br. at 3). Thereafter, T&B and Seller entered into an Addendum to the APA, dated June 4, 1993, for the purposes of "clarify[ing] the allocation, under the [APA], of such rights, liabilities, and responsibilities arising out of the manufacture and sale of products of Seller." (Compl. ¶ 17; Compl. Ex. B, "Addendum" at 2).[5] Of importance to the underlying dispute here, the Addendum contains the following indemnification provision:

> Seller agrees that under the [APA], T&B is not responsible for asbestos-related claims or asbestos-related litigation arising out of

---

[2] Defendant "is successor by merger and name change to" ITT Corporation—a party to the APA and Addendum. (Def. Br. at 2 n.2; *see also* Compl. ¶ 23).

[3] Citations to the APA correspond to the pagination generated by ECF.

[4] The APA defines the term "Businesses" to include the Reznor Business. (APA at 33).

[5] Citations to the Addendum correspond to the pagination generated by ECF.

products manufactured by Seller or its predecessors prior to the date of closing of the Agreement. Seller shall be responsible to retain counsel, to defend at its sole expense, and to pay any judgment rendered against Seller, T&B, or both, in all actions, whether currently pending or commenced in the future, alleging liability of Seller, T&B, or both, arising out of exposure to asbestos incorporated in products manufactured by Seller or its predecessors prior to or on the date of closing of the Agreement, that is, June 29, 1985.

(Addendum at 7). The Addendum further provides that it "constitutes an amendment to the [APA]," and that "it[] shall be binding on and inure to the benefit of the parties and their respective successors, assigns, personal representatives or beneficiaries of any kind, executors, and administrators, as the case may be." (*Id*. at 10).

Of particular relevance to this motion, the Addendum contains a dispute resolution provision (the "Dispute Provision"), which provides:

In the event the parties are unable to agree concerning a claim or issue arising under the [APA] or this Addendum, or if at any time Seller or T&B believes the other party is delaying unreasonably action required pursuant to the Agreement or this Addendum, counsel retained pursuant to subsection C.(3), supra, if any, shall recommend a resolution in the best interests of both Seller and T&B. If that recommendation is not accepted by the parties, the determination of the claim or issue shall be referred to and made by the general counsels of [Defendant] and T&B. If the general counsels are unable to agree on resolution of the issue within ten (10) days of the referral, then the general counsels shall select an independent third party to decide the issue. If the general counsels are unable to agree on the selection of the independent third party, the selection shall be made pursuant to the rules of the American Arbitration Association.

The determination made by the independent third party shall be final and binding on the parties, subject to appeal only for the grounds set forth in New York Civil Practice Law and Rules §§ 7511(b)(1)(i) and 7511(b)(1)(ii). . . .

(*Id*. at 8). Sometime after execution of the Addendum, T&B merged into Thomas & Betts Corporation. (Compl. ¶ 21). In April 2014, Plaintiff acquired the Reznor Business from Thomas

& Betts Corporation. (*Id*. ¶ 22). Plaintiff alleges that it is a successor to T&B as it relates to the Reznor Business, and that the APA "is binding upon and inures to" its benefit.[6] (*Id*. ¶¶ 22-23).

Plaintiff further alleges that, since the APA's execution, "numerous asbestos-related claims arising out of products manufactured by Seller or its predecessors prior to the date of closing of the [APA] have been asserted against Buyer or its successors, including T&B and [Plaintiff]." (*Id*. ¶ 31). Moreover, Plaintiff alleges that "[f]or several years after the execution of the [APA], Seller honored its contractual obligations and indemnified Buyer or T&B against such claims. Eventually, however, Seller ceased providing indemnification as required by the [APA]." (*Id*. ¶ 24). Consequently, Plaintiff commenced this action to enforce Defendant's "clear and unambiguous" indemnification obligations under the APA and the Addendum. (*Id*. ¶ 31).

## STANDARD OF REVIEW

"In deciding motions to compel [arbitration], courts apply a 'standard similar to that applicable to a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). "As on a motion for summary judgment, the parties may submit documents in support or opposition of their motion, and the court 'consider[s] all relevant, admissible evidence submitted by the parties and

---

[6] The APA is signed by Seller and FL (APA at 189), and the Addendum is signed by Seller and T&B. (Addendum at 11). The Addendum provides that it "constitutes an amendment to the [APA]," and that "it[] shall be binding on and inure to the benefit of the parties and their respective successors, assigns, personal representatives or beneficiaries of any kind, executors, and administrators, as the case may be." (*Id*. at 10). Although Plaintiff is not a signatory to the APA or Addendum, it alleges—over Defendant's objection— that it is a successor to T&B as it relates to the Reznor Business, and is therefore owed indemnification by Defendant under the APA. (Compl. ¶ 22; Def. Br. at 11 n.3). Ultimately, whether Plaintiff is a successor to T&B is irrelevant to the analysis here, because regardless of Plaintiff's successor status, "a nonsignatory who exploits a contract containing an arbitration clause is estopped from repudiating that clause." *Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 27 Misc. 3d 391, 397 (Sup. Ct. 2010); *see also Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1133 (N.Y. 2013) ("[A] nonsignatory may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement[.]"). By commencing this action, Plaintiff seeks to "exploit" the benefit of indemnification for the asbestos-related claims against it—a benefit that "flow[s] directly from" the APA. *Belzberg*, 999 N.E.2d at 1136.

contained in pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, and draws all reasonable inferences in favor of the non-moving party.'" *Cornelius*

*v. Wells Fargo Bank, N.A.*, No. 19-CV-11043, 2020 WL 1809324, at *4 (S.D.N.Y. Apr. 8, 2020)

(quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (alteration in original)).

"If the party seeking arbitration demonstrates its entitlement to arbitration by a showing of

evidentiary facts, the burden then shifts to the opposing party to submit evidentiary facts

demonstrating there is a dispute of fact showing that the agreement is inapplicable or invalid." *Id.*;

*see also Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 284 (S.D.N.Y.

2019) ("[T]he 'party to an arbitration agreement seeking to avoid arbitration generally bears the

burden of showing the agreement to be inapplicable or invalid.'" (quoting *Harrington v. Atl.

Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010))). Opposition "may not rest on a denial but must

submit evidentiary facts showing that there is a dispute of fact to be tried." *Citadel Servicing Corp.*,

431 F. Supp. 3d at 284 (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.

1995)). "'If undisputed facts in the record require[] the issue of arbitrability to be resolved against

the [p]laintiff as a matter of law,' then a district court must compel arbitration." *Shetiwy v. Midland

Credit Mgmt.*, 959 F. Supp. 2d 469, 473 (S.D.N.Y. 2013) (quoting *Bensadoun*, 316 F.3d at 175

(alterations in original)); *see also Klein v. Experian Info. Sols., Inc.*, No. 19-CV-11156, 2020 WL

6365766, at *3 (S.D.N.Y. Oct. 29, 2020).

The Federal Arbitration Act ("FAA") provides, in pertinent part, that:

> [a] written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction . . . shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at law
> or in equity for the revocation of any contract.

9 U.S.C. § 2. "This provision establishes 'a liberal federal policy favoring arbitration agreements,'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and "reflects the overarching principle that arbitration is a matter of contract," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 223 (2013). *See also Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532-33 (2013) (explaining that the FAA "requires courts to enforce the bargain of the parties to arbitrate" (internal quotation marks omitted)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (noting that "courts must place arbitration agreements on an equal footing with other contracts"); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (observing that the FAA "places arbitration agreements on equal footing with other contracts, and requires courts to enforce them according to their terms" (internal citations omitted)); *Safra Secs., LLC v. Gonzalez*, 764 F. App'x 125, 125 (2d Cir. 2019) ("Whether parties have agreed to arbitrate a matter is fundamentally a question of contractual interpretation."). "'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985) (quoting *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25).

Where, as here, the "dispute essentially concerns a question of arbitrability, which is a term of art covering disputes about whether the parties are bound by a given arbitration clause, as well as disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy," courts in the Second Circuit apply a "two-part test." *Ostreicher v. TransUnion, LLC*, No. 19-CV-08174, 2020 WL 3414633, at *5 (S.D.N.Y. June 22, 2020) (cleaned up). Under this test, the Court "must consider (1) whether [the parties] 'have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the

arbitration agreement.'" *Scott v. JPMorgan Chase & Co.*, 603 F. App'x 33, 35 (2d Cir. 2015) (quoting *In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)). Before reaching the second element, however, courts must "determine who—the court or the arbitrator— properly decides the issue." *In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d at 128 (citing *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011)). "[T]he question of arbitrability is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Alcoa Corp. v. Anheuser-Busch InBev SA/NV*, No. 20-CV-03834, 2020 WL 5229706, at *2 (S.D.N.Y. Sept. 2, 2020) (internal citations and quotation marks omitted).

## ANALYSIS

As a threshold matter, Defendant argues—and Plaintiff does not contest—that the Dispute Provision constitutes a valid arbitration agreement within the meaning of the FAA. The Court agrees, as the Dispute Provision "'clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution.'" *Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146, 152 (2d Cir. 2019) (quoting *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988)).

Plaintiff, in its opposition, concedes that its first two claims for relief—breach of contract and specific performance—"fall within the scope of the Dispute Provision," and are, therefore, subject to its terms. (Pl. Opp. at 7, 21). Plaintiff, however, insists that its tort-based implied indemnification claim is not subject to the Dispute Provision's terms because it does not arise under the APA. (*Id*. at 1, 8, 17-18). Accordingly, because the parties agree that Plaintiff's first two claims for relief fall within the Dispute Provision's scope, the only remaining issue to be resolved on this motion is whether Plaintiff's tort-based implied indemnification claim does, too.

Before reaching that issue, however, the Court must decide whether it, or an independent third party, should resolve this question. *See In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d at 128. "Federal and New York law alike recognize both the 'well settled proposition that the question of arbitrability is an issue generally for judicial determination' and the 'important legal and practical exception' that applies when parties 'evince a clear and unmistakable agreement to arbitrate arbitrability.'" *Blash v. BCS Placements, LLC*, No. 19-CV-06321, 2020 WL 2832777, at *4 (S.D.N.Y. May 31, 2020) (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). The Court concludes that the parties have evinced a clear and unmistakable agreement to arbitrate the question of arbitrability for at least two reasons.

First, the Dispute Provision covers all "claim[s] or issue[s] arising under the [APA] or th[e] Addendum." (Addendum at 8). Such broad language, "even absent an express contractual commitment of the issue of arbitrability to arbitration . . . reflects . . . a 'broad grant of power to the arbitrators' as to evidence the parties' clear 'inten[t] to arbitrate issues of arbitrability.'" *Shaw Grp. Inc.*, 322 F.3d at 121 (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1200 (2d Cir. 1996)); *see also Blash*, 2020 WL 2832777, at *4 (finding "clear and unmistakable agreement to arbitrate arbitrability" where arbitration clause submitted "'*all* claims, disputes and other matters in question arising out of or related to, this letter agreement or the performance thereof' to binding arbitration" (emphasis in original)); *Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 889, 994 (N.Y. 1997) (finding that "an arbitration clause requiring that 'any controversy' be arbitrated" was sufficiently "plain and sweeping" to indicate an intent to have arbitrability decided by arbitrators).

Second, and alternatively, the Second Circuit has squarely held that "when . . . parties explicitly incorporate rules"—such as the rules of the AAA—"that empower an arbitrator to decide

issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co*., 398 F.3d 205, 208 (2d Cir. 2005); *see also Micheli & Shel, LLC v. Grubhub Inc., et al.*, No. 21-CV-04995, Doc. 79 at 10 n.5 (S.D.N.Y. Mar. 1, 2022) (finding arbitration agreement's reference to AAA rules require delegation of threshold questions of arbitrability to arbitrator); *Passero v. Ford*, No. 20-CV-05631, 2021 WL 1299507, at *4 (S.D.N.Y. Apr. 7, 2021) (finding that "the parties clearly and unmistakably agreed that the question of arbitrability is for the arbitrator to decide" where the parties' arbitration clause "explicitly refer[red] to the rules of the American Arbitration Association"); *Blash*, 2020 WL 2832777, at *4 ("[T]he parties' intent to arbitrate arbitrability is further evinced by the arbitration clause's incorporation of the rules of the [AAA]."); *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 470 (S.D.N.Y. 2020) ("[W]hen the parties explicitly incorporate into an arbitration agreement the AAA Rules, this serves as clear and unmistakable evidence of the intent to delegate questions of arbitrability." (internal quotation marks and brackets omitted)); *Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 283 (S.D.N.Y. 2015) (finding that "a party who signs 'a contract containing an arbitration clause and incorporating by reference the AAA rules . . . cannot [later] disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability'" (quoting *Lismore v. Societe Generale Energy Corp.*, No. 11-CV-06709, 2012 WL 3577833, at *5 (S.D.N.Y. Aug. 17, 2012))). Here, the Dispute Provision states, in pertinent part, that if the parties' "general counsels are unable to agree on the selection of the independent third party, the selection shall be made pursuant to the rules of the [AAA]." (Addendum at 8).[7] Accordingly, the Court concludes that the Dispute Provision's

---

[7] As Defendant states in reply, by incorporating the AAA rules governing the selection of an arbitrator, the Dispute Provision necessarily incorporates all other AAA rules, because an arbitrator selected under the AAA rules is required to "interpret and apply [AAA] rules insofar as they relate to the arbitrator's powers and duties" and "[a]ll other rules shall be interpreted and applied by the AAA." (Reply at 3 (citing AAA

explicit incorporation of the AAA rules evinces the parties' clear and unmistakable intent for an independent third party to resolve the question of arbitrability.

Because the Dispute Provision explicitly incorporates the AAA's rules, an independent third party will determine whether Plaintiff's tort-based implied indemnification claim falls within the Dispute Provision's scope, and the Court will abide that event. *See Passero*, 2021 WL 1299507, at *4.

## <u>CONCLUSION</u>

In light of the foregoing, the Court GRANTS Defendant's motion to compel arbitration. The parties are directed to comply with the terms of the Dispute Provision with respect to Plaintiff's claims for breach of contract and specific performance. Whether Plaintiff's tort-based implied indemnification claim is subject to the Dispute Provision will be determined by an independent third party. The action is stayed pending arbitration.

The Clerk of the Court is respectfully directed to: (i) terminate the motion sequence pending at Doc. 9; and (ii) administratively close this case, without prejudice to either party moving by letter motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.[8]

**SO ORDERED:**

---

Commercial Arbitration Rules and Mediation Procedures (Oct. 1, 2013) ("AAA Rules") at R-8)). Notably, AAA Rule 7(a) provides arbitrators with "the power to rule on his or her own jurisdiction, including any objections with respect to . . . the arbitrability of any claim or counterclaim." AAA Rules at R-7(a).

[8] *See Zimmerman v. UBS AG*, No. 17-CV-04503, 2018 WL 4054860, at *6 (S.D.N.Y. Aug. 24, 2018), *appeal dismissed*, 789 F. App'x 914, 915-16 (2d Cir. 2020) ("The district court's administrative closure of the case does not constitute a final decision: there is no jurisdictional significance to [a] docket entry marking [a] case as 'closed,' which we will assume was made for administrative or statistical convenience.").

Dated:  White Plains, New York
        March 4, 2022

_____
Philip M. Halpern
United States District Judge